The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning, ladies and gentlemen, judges, payas, and bumatay, and I welcome you to the Ninth Circuit. We have a number of matters on for argument today, and we also have several matters that have been submitted on the briefs. I'm going to call the submitted matters first just to get those handled, and then we'll go to the argument matters, and I'll come back and talk a little bit more. The first submitted matter is Eric Tucto Sanchez v. Todd Blanche, 17-73325. Submitted on the briefs will be submitted as of this date. The next submitted matter is Nelda Esmeralda Pena Portillo, Darlene Elizabeth Portillo Pena v. Todd Blanche, 18-70315. Submitted on the briefs, submitted as of this date. And the last submitted matter is Paolo Ricardo Nunez Dos Santos v. Todd Blanche, 25-5284. Submitted on the briefs, submitted as of this date. Now, if you're here on an argued matter, you have a time designation by your case. If you are the appellant, that time designation includes that's your total amount of time. So any time you wish to reserve for rebuttal comes out of that time. I know that we do have one matter where people are sharing time. And so if you are sharing time, it's designated on the calendar there, and those people that are sharing time are appellees, so we don't have to worry about rebuttal time. Obviously, I know that you all came here to say certain things, and I hope you get to say them, but you also have to understand we have to decide your cases, so the judges are going to have questions of you. And so when the time has run out, if any of my colleagues or I are asking you questions, you don't need to ask permission. Please continue to answer questions as long as the court has any questions of you. If you are responsible for keeping track of your time, the clock counts down and then it goes up. It doesn't really mean I gave you extra time. It means you've moved into overtime, and I will generally keep people to the time allotment unless my colleagues have any questions. If you are the appellant and you aspirationally would like to reserve any time for rebuttal, it's your responsibility to keep track of the time. But if you tell me how much time you'd like to save, I am looking at a clock, and I will try to remind you of that. The first matter on for argument is Sarah Royce et al. versus Rob Bonta. We do have the appellant's lawyer is here remotely. I can see you fine. Can you hear us okay? Yes. All right. Can you hear okay over at appellee's table? All right. Great. That's 25-2504. Each side has 10 minutes in this matter. So we're ready to proceed, and we're ready to start with the appellant. Thank you. May it please the court. Erin Marcino on behalf of four California mothers, Sarah Royce, Sarah Clark, Tiffany Brown, and Christy Carraway. May I reserve two minutes for rebuttal? Hopefully. Go ahead. Thank you. SB 277 presents appellants with the untenable choice to violate their sincerely held religious beliefs or deny public and private schooling to their children. The lower court erred in dismissing appellant's complaint because it applied rational basis review instead of strict scrutiny. Strict scrutiny applies here for at least three reasons that I'd like to address today. First, that it lacks general applicability under Fulton. It misapplied the comparator analysis under Tandon. And strict scrutiny applies because of recent Supreme Court precedent in Mahmoud v. Taylor, Miller v. McDonald, and Mirabelli v. Bonta, which confirmed that when the state burdens parental religious rights concerning their children's upbringing, education, and medical decisions, that strict scrutiny applies. We ask that the court reverse the decision of the district court with instructions to apply strict scrutiny or enter judgment. Counsel, did you raise the Mahmoud issue in your briefing? So Mahmoud's application to vaccination cases occurred when the Supreme Court issued the GVR in Miller v. McDonald. And as soon as the Supreme Court issued that GVR, we filed a rule 28J letter preserving that argument, yes. Well, was Mahmoud decided before the briefing and this before us? Mahmoud was, but its application to these vaccination cases had not occurred until Miller v. McDonald. You didn't see an argument there after Mahmoud came out? Well, I certainly saw it very clearly after the Supreme Court issued the GVR. No, no, no. I said after Mahmoud came out. So at that point, there was the cert petition that was arguing, but it wasn't settled. But you didn't think you could raise it in your brief here? Well, it would be a decision that the Supreme Court would have to correct for itself. That's not my question. Yes. So I think that it became very clear that it would apply to vaccination cases when the Supreme Court issued its GVR. And so at that point, there is comfort in raising that argument. So the district court didn't consider Mahmoud, correct? Obviously. The district court did not because it was not decided yet. So can you go into your Fulton argument? As I read the regs, it seems like there's a discretion to deny a medical exemption, right? Not to grant a medical exemption. Yes. So there's several exemptions under Fulton. So as you know, a law is not generally applicable when there is this mechanism that even allows for these individualized exemptions. But in Fulton, it seemed like the exception was the ability to grant the adoption, right? A discretionary exception to grant the adoption. Where here, it's a discretionary to deny the medical exemption. Well, so it's interesting because in Fulton, the holding says, OK, individualized mechanism. But the next thing that the court says is that, for example, Sherbert, and it goes into, OK, in that case, obviously the employee was denied carte blanche, any sort of religious exemption to finding work on Saturdays. So it went into an example of more of a categorical exemption based on kind of a religious categorical test. So a religious exemption wasn't good enough to meet the good cause standard in Sherbert. So I don't think I think that some cases have kind of misconstrued it, saying that it's up to the sole decision maker and different things. But when you put together Fulton and put together Tandon, if there are those different comparisons and there are a different scheme of exemptions, then you can't treat the religious exemption worse than the secular exemptions. Well, yeah, I understand that, but I'm just trying to say how I'm trying to understand how the medical exemption, discretion to deny medical exemption is like the exemption in Fulton, which it's like the opposite almost. It's like in Fulton, it's a discretion to grant a benefit, where here is it's like a discretion to deny the benefit. Yes, I mean, it is kind of different in the construct. Right. So I definitely see what you're saying. Right. But it still is a case by case individualized exemption between the person who is applying for the exemption. They have to go to their physician. It's based on family history and a number of different individualized factors. And the fact that it exists, a secular exemption exists, exists at all, I think is really important to the analysis. And that's not the only exemption. There's a multitude of exemptions in SB 277. Which is the closest to yours? I mean, not every. Obviously, this is a law that's trying to protect the public here. And some other cases that we talk about are not protecting the public health in the same way. Does that matter? So I think all of the exemptions pose the same risk to the state's asserted compelling interest. Because they are exemptions to SB 277. Well, how many more people that. OK, so everyone that's not vaccinated is going to pose some sort of risk to people. So why. But what are you most comparative to? Because if you get a religious exemption, my understanding is then you would get it forever. So you would always be unvaccinated. Right. And some of the other ones, it says, well, it's temporary or so. So I think maybe or maybe not someone could have a life event where they become an atheist or they could have a religious objection to the use of abortion. So I don't know that it is permanent, but medical exemptions can be permanent. And I think just the multitude of all of the exemptions, the medical exemptions, the 30 day period when first enrolling the individualized study programs, the IEPs, all of the IEPs that are exempt in the high number. Eleven percent, according to the California Department of Education's numbers of students could receive that exemption for their IEP services. All of the exemptions for immigrant students, foster care students, homeless students, students who are over the age of 18, students. Well, so hypothetically, hypothetically, if we were to agree with you, I'm not saying that we we we haven't decided the case. So we're just having an argument here. So hypothetically, if we were to agree with you, the the district court here did not apply strict scrutiny. Should we send it back? If we said strict scrutiny is the standard, should we send it back to the district court to apply? Yes, I think that or should we apply it? You could either reverse and you could apply it or you could send it back. Well, I know what we can do. I'm telling I'm asking you what what you're the advocate here. What are you saying we should do? Yes, I would like if you would apply strict scrutiny. I have one question for you. I know your time is running down, but maybe our presiding judge will give you some extra time. I will. But so, you know, in looking at all the cases, it seems to me, at least with respect to medical exemptions, that the Second Circuit, the Third Circuit, the First Circuit, the Fourth Circuit, as well as a motions panel here at the Ninth Circuit, concluded when they sort of looked at this regarding the medical exemptions, that medical exemptions aren't comparable to religious exemptions because they serve, not undermine the state's interest in vaccination in schools and general public health. And you're asking us to sort of take a different approach. And I want to know why, when we have all this case law out there. So Miller versus McDonald, Doster in the Sixth Circuit, Doe's 1 through 26 versus Biden in the Fifth Circuit. But also, it's not been established in any way that applying the small number of religious exemptions would frustrate the state's compelling interest in any way. Here, the personal belief exemptions. This is in paragraph 35 of the complaint. We're at the level of 2.5% when the law was changed to exclude all personal belief exemptions and religious exemptions. So the number of religious exemptions would be smaller than that. It's lesser included within that umbrella of personal belief exemptions. And we can see from the CDC's data that when you look at states that allow both personal belief exemptions and religious exemptions versus states that only allow religious exemptions, it's far, far less. I may be wrong about this. And you can correct me because, you know, you may know the record better than I do. But I think I read someplace in the briefs that just prior to the time the legislature enacted, removed the personal exemption from the statute, the number of religious exemptions had gone up quite substantially. Is that correct? Right before the law was enacted, they were actually on the way down. They hadn't gone up at all? No, they were going – the direction was going down. Here in California? Here in California. I think medical exemptions went up. That's what I meant, medical exemption. I thought they went up. For medical exemptions. Okay, I may be confused. So you know it better than I do. Oh, no, but just looking at, you know, if the state opens the door with one exemption and then opens it even further, and then here they're opening it so wide to include 11 percent of the students with the IEP exemptions. They've opened it so wide, but yet they can't open it. Just the tiniest crack for these four parents. Yeah, go ahead. Can I ask, can you explain the independent study exemption and how that is a proper comparator? Sure. That's conceptually the hardest to wrap your head around because the students are at home, right, not at school. Yes, but they can go to school for certain purposes and they can participate in extracurricular activities and sports. So they can wrestle with someone and be unvaccinated while doing that, you know, in close proximity. Was the state's interest in vaccinating students at school or was it an interest in vaccinating all children? Excuse me. I believe they can probably answer it better, but it seems that their stated interest is that they wanted children to be vaccinated across the board and they wanted to achieve herd immunity. Because the reason was the Disney incident, right? Yes, but they didn't regulate theme parks. Right, so it's all students, it's all kids, not students at school is the interest. Is the interest, but it's then under-inclusive and includes so many exemptions. Which is why the exemption for independent students, study students, makes less, is a proper comparator. Yes. But the law here is designed for students, correct? Isn't that the state's interest here is obtaining immunity within the schools? The interest is, I believe, to try to vaccinate all children, but then it includes so many exemptions. But if you look, don't we have to look at it and see what the statute says? Otherwise, I mean, you know, this is all about the statute, correct? It is all about the statute, the construction of the statute, and how it violates the First Amendment under Tandon and Fulton, and that it doesn't pass strict scrutiny. But looking at, I would say, the different comparators and how that factors into the analysis, I think that certainly is one of the most important things in factoring into the analysis. Because they look at the purpose for why the exemption is being granted versus the risk that it could pose. And all of the exemptions pose the exact same risk. And so the state argues kind of more generalized, broader interests, and say that that's the compelling interest. But of course, as we know in Fulton, the component that has to be... Wasn't the state's stated compelling interest herd immunity? And so you wouldn't exclude some people from herd immunity? The whole point is to get everyone vaccinated, right? But 100% is not required for herd immunity either. And there hasn't been any showing of how many religious exemptions would actually be in place here. But we know that for these four individuals, the question is, is there a compelling interest for these four moms to vaccinate their children? And their children only make up 0.00017%. So you have 46 states have religious exceptions, right? And California used to. Does that matter at all? Does that matter at all? Or if it does, how does that factor in? I think it can give solace that the sky won't fall if a small religious minority is allowed to have a religious exception in accordance with the First Amendment. And you can look at the numbers of the other states and the small numbers of religious exemptions that are taken advantage of throughout the states. And that it has not had this sort of disastrous effect on preventing communicable disease, as the state is arguing. What would the state have to show to meet strict scrutiny? I'm assuming that they could in certain instances. Is that correct? Or do you concede that? Are you saying, are we trading or would be creating? I mean, there should be some instances where strict scrutiny could be satisfied, right? Or it wouldn't be a standard. It would be an ultimatum. The test exists for a reason, that they would have to meet the standard of compelling interest and narrowly tailored and least restrictive means. And they have not done that here. But can you give me an example of where you think that could happen? Would it depend on the type of disease? Does it matter what type of disease we're vaccinating against? Well, I think first and foremost, if you're looking at whether or not something would pass First Amendment scrutiny, the fact that there are all of these other exemptions, I think, really hurts their statement that there's a compelling interest in specifically these four individuals. So I think instead of having a door wide open situation, it would be a door closed or almost completely closed. And the fit would have to be very tight. You'd have to show they studied, you know, quarantining. They studied masking. They studied social distancing. They studied all of these other ways to stop communicable disease. And they all failed. And there's a factual record of them failing. All right. We've taken you over, obviously. And I'm sure we'll take the other side over. So I'll probably give you two minutes for rebuttal. All right. Thank you. Thank you. We'll hear from the state. Good morning, and may it please the court. Andra Lim for Dr. Erica Pond. Morning. I'd like to address the issue of the state's interest. But before that, I would just like to offer a few preliminary thoughts. California's law has long been a cornerstone of the state's public health and safety regulation. For the millions of students in our state, the law ensures that when they go to school, they're protected from diseases that can have serious health consequences and even cause death. Every court of appeal that has considered a free exercise challenge to a similar school immunization law, including this court in Doe, and most recently the first circuit. But 46 other states are getting by just fine without eliminating a religious exception. And you are giving other exceptions. And you used to have that religious exception. So is the sky really falling now? Two points on that, Your Honor. First, as to the other 46 states, I don't believe there's data on that in the record. But there is publicly available data from the CDC showing that California has by far the largest population, yet the number of measles cases in California is similar to those in much, much smaller states that do have a religious exemption. So I'm not sure it's accurate to say that there are no problems in those other states. Second, I think California's specific experience showed that it needed to repeal the personal beliefs exemption in its entirety. Before the passage of SB 277, the rate of PDEs, personal beliefs exemptions, had increased by 337 percent. Is that what I read someplace in the briefs? The 337 percent? Yes, that is in the briefs. So what your friend on the other side just said, that's not what she just said. So tell me how both of those can be true or not true. So I think overall, when you look at the span from 2000 to 2012, there was a significant increase in PDEs overall. I think there may have been a slight decrease from one year to the next. But overall, the overall trend was this huge, huge increase. Why do you have to get rid of everything? Why couldn't you just get rid of the personal belief exception but keep the free exercise exemption? So what the legislative history reflects is that in some communities in California, the rate of unvaccinated students was really, really high. How many communities were those? I'm not sure it's not mentioned in the legislative history. The legislative history does, though, refer to 21 percent. So are we supposed to credit that if we don't even know what they're talking about? Well, I mean, I do think that what is in the legislative history, there's no— But we don't even know what they're talking about. You don't even know what community they're talking about. I mean, I do think we know that what the history says, that there were communities with those numbers and that there was this measles outbreak in California. If we don't pass any rational basis, we don't even know what community they're talking about. Well, I think rational basis is a very deferential standard. Yeah, but you have to explain where you're getting your facts. You can't even explain what community you're talking about. Well, I do think one thing that is in the legislative history is about the measles outbreak that happened in Southern California. Right. Okay, so move on to that. That the legislative history explains was caused in large part to the large number of unvaccinated students.  Sorry? At Disney. At Disneyland, yes. I think the state's interest here, if I could return to that point—  So I think there are two state interests here, and then there's sort of a downstream effect of those interests. So the two state interests here, one, it's achieving and maintaining herd immunity within schools. And then second, protecting— No, wait. Within schools? Yes, it's on page 257 of the Grimsby excerpts of record. It talks about how the legislature wanted to ensure safe schools, safe school campuses. Well, isn't there an asserted purpose in the legislation itself? I mean, I think what the legislature— 12035—oh, wait, 325A? I'm sorry. Doesn't it say that it means for eventual achievement of total immunization of appropriate age groups against certain childhood diseases? So I think the total immunization language was not added in SB 277. That language has been there since at least 1995. And so it was in effect the entire time. It was in effect before SB 277. And it was in effect in a time when the personal beliefs exemption was in effect. And so I don't think it's possible to read that language as saying the legislature wanted every single student, every single child to be immunized, because that language was in effect again when this personal beliefs exemption was in effect. So we should disregard that legislative purpose? Well, I think just given the context I was just describing, I think that total immunization is best read as referring either to, A, herd immunity, or B, that students covered by the law must be totally immunized against all 10 diseases that are listed in the law. And I would say that the total immunization question, that's really a question of California state law. You know, under California law, the Supreme Court has emphasized the need to give statutes of practical, workable construction. I think the practical construction is not that it was referring to immunization of every single student or every single child. So I'm having a hard time understanding why some of the people that you're allowed not to be immunized for maybe 30 days, or people that have IEPs or whatever, why they get that exception and someone that's protected by the First Amendment doesn't get off first base. Well, I think what matters here is that comparability is adjudged with reference to the asserted state interest, which again are herd immunity within schools and protecting the health and safety of individual students. So with the conditional enrollment provision, it's just providing this temporary grace student for students to get vaccinated. And so that does ultimately further the state's goals in achieving herd immunity. But if they come for 30 days and they've got, you know, all sorts of diseases, they can do a pretty good job in 30 days, right? Well, what the legislative history discusses is how herd immunity, you know, depends on there not being large numbers of students over time who don't get vaccinated. I don't think that a 30 day period affects herd immunity in the same way as giving someone a religious exemption that could potentially be permanent for years. I don't think. But why? What are you basing that on? Is it more than a thought? Well, the conditional enrollment provision is temporary. A religious exemption is often permanent. And so those two things are different when it comes to the state's interest in achieving and maintaining herd immunity. They're also different when it comes to the state's interest in protecting the individual child. The student with a conditional enrollment does ultimately get vaccinated and is protected. But why do you have to let them in? Why can't you just mandate that they provide the immunization before they get into the school? And then you better serve the interest in herd immunity within schools if that's the interest. Two points on that, Your Honor. First, what the law actually says is that this exemption or sorry, this provision is for students who are missing immunization records. And so it's not the case that all the students to whom these provisions apply actually lack the required immunization. For some of them, it's a matter of missing paperwork. And then my question is, why don't you demand the paperwork before they get to schools? Because that's better serves the interest. Well, I think we disagree with the premise that it that it that is that it is comparable from that it is comparable with respect to the interest as a religious exemption. And that's not my point. The interest is if the person is you don't know whether the student is immunized or not. Right. And you're letting them in the schools for at least 30 days. Why not exclude them from schools before they enter? So then the risk of them spreading diseases is zero. But I think the free exercise question, Your Honor, is that's not my question. I'm asking about these students. Why not let them. Why exclude. Why not exclude them first. So I will say for a couple categories of students, I think for one category of students, it is a federal law requirement that also discusses this. And then there's also the military. That's something different. Right. Are talking about conditional students. Yes. I just don't understand how that serves even rational basis that you're letting them in, even though you don't know if they're immunized or not. Even if it's only temporary. I mean, the rational basis review is a fairly deferential standard of review. I understand. But what's the reason? You have to give me a reason. I think the reason is that that some of these categories of students are missing records. And the law allows them to be enrolled for a very short period of time until they can get their records or get immune or get immunized. But why? I mean, I think the idea is that they shouldn't be excluded from, you know, they should be allowed to attend school and quickly come into compliance. Why should they get that right and not religious students? Well, I think the right that the plaintiffs are seeking is different. They're not seeking a 30 day period. They're seeking a permanent religious exemption. And so I think the two are really distinguishable. But but you're still you still you have to admit, though, letting students where you have no immunization record into school for even a temporary amount of time is a big risk. Right. It risks spreading of diseases. There is a risk. But I don't think it's the rest of the legislature was concerned about. The legislature was concerned about the herd immunity. Absolutely. That's not the statutes willing to take. And you mentioned federal statutes. So when you have federal statutes, you're saying, OK, well, that means we should take the risk. And the religious liberty people say, well, we have the First Amendment. We have the Constitution. So are statutes or the Constitution more important? So if your honor is referring to the IEP provision, I think. Yeah, I think that what Judge Acuda said in her dissent in the Doe case, which the majority there agreed with, is absolutely correct. All the IEP provision is doing is recognizing a federal limitation on California's ability to regulate. And because of that, unvaccinated IEP students, what she said is they just don't factor into the general applicability analysis. We just don't consider that population when looking at whether the law is generally applicable. And again, you know, that's what her dissent said. And the majority agreed with that. We think that's absolutely correct. You know, the purpose of the comparability analysis is to figure out whether the state has passed a law that's differentially treating secular and religious conduct that is similarly situated. You know, the purpose is to figure out whether the law is discriminating against religiously motivated conduct and recognition of a federal law limitation on California's ability to regulate. It just can't reflect any sort of discrimination by California against religion, any decision by California to favor secular conduct. So if hypothetically, if we were to decide that strict scrutiny applies, can you meet that here on this record? We think we can meet strict scrutiny here on this record. Tell me how. Yeah. So again, it goes back to just the fact that there were really, really high rates of unvaccinated individuals in certain communities. And that repealing the entire personal beliefs exemption was necessary to bring those levels down to the herd immunity threshold. I think the measles outbreak that occurred is also important here because it shows the stakes of not achieving herd immunity. Are these high rates of unvaccinated people? Are they attributed to religious exercising their religious rights? Or is it just their high? There's a lot of unvaccinated people. Well, what the legislative history reflects is that there was a gigantic increase in personal beliefs exemptions, which would have included both people with religious beliefs and people with other philosophical objections to vaccines. So, I mean, can we go back to you? You started saying and the reason why they didn't eliminate just the personal belief and keep the religious is because there's some communities that there are higher rates of diseases, right? There are some communities with higher rates of unvaccinated. So are we to presume that those are religious communities because that was your explanation? Well, I think when you pair the very high number of unvaccinated people with the fact that personal beliefs exemptions had really, really increased the way the way to solve that is by eliminating the personal exemption. No, but that makes no sense because you could get rid of personal belief exception and keep the religious exemption. Correct. I think that would have theoretically been possible, but I think the numbers are high. And then the reason why you say they didn't do that is because there are some communities that had high rates of infection. And so presumably you mean religious communities. Well, the outbreak that the legislative history refers to is the Disneyland Measles outbreak. I think. But which communities were they referring to? The 21%. The legislative history doesn't specify. Can we infer that they're religious communities? Because that's why you explain why you got rid of personal beliefs. But I mean, you could because you could theoretically get rid of personal beliefs and keep religious. And the reason why you said they didn't do that is because there are some communities that have higher rates of infection. Right. So presumably you mean that religious communities have higher rates of infections. I mean, as our brief does discuss in states that do have data on religious exemptions versus, you know, medical exemptions, like the rate of religious exemptions is a lot higher. And we have data from other states right now that have. These are higher rates of infection among those with religious exemptions. Well, as I mentioned before, there is recent data from the CDC about measles cases. California has a much, much larger population, has the same number or similar number of measles outbreaks of states that are much, much smaller. But do you have a religious in place? I mean, you answer the question, though, are those with higher rates? Are they religious communities? The legislative history doesn't doesn't discuss that. I will say, Your Honor, that if if the court has doubts about strict scrutiny, we would at least ask that you remand and give us a chance to develop a factual record on strict scrutiny. It would be possible, you know, for instance, for us to try and develop a factual record on some of the questions that the court has had. I think it's very possible you can meet strict scrutiny, but. But it should be strict. Your point is it's strict. Strict scrutiny is not required, right? Yes, we believe the law is neutral and generally applicable and satisfies rational basis review. And we also believe that there is no reason to apply strict scrutiny under Mamu and Mirabelli or Yoder. I will just note on the point that that my friend on the other side made about the Miller case, you know, that was just a GBR by the Supreme Court. The Supreme Court has been clear that a GBR just means that there's a possibility that its precedent could could affect the case. It doesn't mean that it in fact does. Do you think Mamu has any applicability here? So we think that Mamu is distinguishable for the reasons that Judge Wilkinson laid out in his Perry opinion. You know, first, Mamu was not a case about a public health measure, and it drew heavily from the Yoder case, which emphasized that the law there law there, you know, did not go to physical health or safety of the child or the community. We think Mamu is also distinguishable because, you know, the law, the policies there were about ideological indoctrination. The school immunization law doesn't involve any sort of ideological indoctrination. And then third, as Judge Wilkinson explained, you know, the Supreme Court has said in Prince versus Massachusetts that that a parent can't claim freedom from compulsory immunization for her child on religious grounds. And we think that dicta is on point. Nothing has disturbed it. And so it should be followed here. But you agree that Mamu is applicable to vaccine cases, though. Based off of Miller. No, I don't think that's what Miller says. I think Miller says that there's a possibility that Mamu could affect, you know, the reasoning of that case or the outcome of that case. But it doesn't say that for sure. And so the Second Circuit is considering that now. We don't have any additional questions, but if you want to take a minute to wrap up, that's fine. Yes, that would be that would be great. You know, this is a law that has long been in effect. It addresses diseases that are really, really serious. Vaccines have proven to be safe, effective and lifesaving. Some of the vaccines required by this law are some of the most effective in history. Cases of polio are exceedingly rare over the last 50 years. You know, the Supreme Court has recently has repeatedly stated in its cases, not just in Prince, but also in the Smith case, that compulsory immunization laws are not subject to strict scrutiny. So we believe that rational basis applies and we believe that the law easily satisfies rational basis. And courts have repeatedly, repeatedly held that immunization laws do satisfy the rational basis test. Does it matter what the disease is? Obviously, I don't know that I'm just sort of reacting viscerally here that obviously polio is like super serious as opposed to. You're dealing with some people here, not the younger, probably, but some of us here that have had every measles, mumps, you know, the whole. And the way people dealt with is that they everyone they put everyone together so that we all got it at the same time and and people weren't really necessarily dying. I'm not against vaccines, but could it does it make a difference what you want people to vaccinate against? Does it matter the severity of it? I mean, there could be some vaccines that aren't, you know, causing that, you know, they aren't preventing the same bad things as others are. Does it matter? Under rational basis review? I am not sure that it would would matter under strict scrutiny review. I guess it's conceivable to, you know, imagine a situation where a state says its only interest is herd immunity and the herd immunity threshold is somehow exceedingly, exceedingly low. You know, maybe maybe that would make a difference. But that's just not the case that we that we have here today. The herd immunity threshold for the diseases targeted by this law is is high for all of them. And so, you know, in this case, I don't think it matters. I don't think that there's a basis for carving up the different diseases targeted by this particular law. OK, thank you for your argument. Thank you. I'll give the appellant two minutes for rebuttal. Thank you, Your Honor. The reality is that the appellant's children are allowed to go everywhere that the children who can be in school, they can participate in extracurricular activities, go to movie theaters, go to theme parks, but they are banned from the schoolhouse. They can't receive an education like the other kids. And California has not established any good reason for such an extreme law. The 2.5 percent of schoolchildren who had personal belief exemptions does not reflect what the actual number of religious exemptions might be. And there's been no no factual indications whatsoever in the record that there's been even an attempt for California to look at that number. Instead, they they took the step they knew that they were taking it to ban any religious exemption. They heard testimony that it violated the First Amendment. They received information from the ACLU at that time. And yet they still enacted the law. Looking at Miller versus McDonald. In that case, the Second Circuit applied rational basis. The Supreme Court vacated that decision. And that in light of my mood versus Taylor, you need to apply my mood versus Taylor, which is very clear that when the state burdens schools, you know, the public education. When the state burdens religious exercise that strict scrutiny applies. It applied Yoder, and it applied the carve out and Smith that said that rational basis review does not apply to these sorts of cases. So the First Amendment does not permit California to condition the fundamental right of education on the surrender of sincerely held religious beliefs while granting sexual secular exemptions that undermine the very same interest. Strict scrutiny must apply here. SB 77 fails it and the district court judgment should be reversed. And at minimum, it should be vacated and remanded with instructions to apply my mood versus Taylor. Thank you so much for your time. Thank you. Any additional questions by the panel? All right. This matter will stand submitted.
judges: PAEZ, CALLAHAN, BUMATAY